# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EVA HOFFMAN**
          **Plaintiff,**

      **v.**                                **Case No. 10-C-1152**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                   **Defendant.**

---

## DECISION AND ORDER

Plaintiff Eva Hoffman applied for disability insurance benefits, alleging inability to work as of November 8, 2006, due to asthma and back problems.  (Tr. at 71, 83-94.)  The Social Security Administration ("SSA") denied the application initially (Tr. at 37, 39-42) and on plaintiff's request for reconsideration (Tr. at 38, 43-47).  Plaintiff requested and obtained a hearing before an Administrative Law Judge ("ALJ") (Tr. at 48-49), but the ALJ likewise found plaintiff not disabled (Tr. at 12-20).  The SSA's Appeals Council declined plaintiff's request for review (Tr. at 1), making the ALJ's decision the SSA's final determination on plaintiff's application for purposes of judicial review.  See McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011).  Plaintiff now seeks such review pursuant to 42 U.S.C. § 405(g).

## I.  LEGAL STANDARDS

In determining whether a claimant is disabled, the ALJ must apply a sequential five-step test, asking:

(1) Is the claimant is engaged in substantial gainful activity ("SGA");[1]

---

[1]"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit.  20 C.F.R. § 404.1572.  The regulations set forth earnings

(2) If not, does the claimant have a severe impairment or impairments;[2]

(3) If so, does the claimant's impairment meet or equal one of the impairments considered presumptively disabling under SSA regulations;[3]

(4) If not, can the claimant, given her residual functional capacity ("RFC"),[4] still perform her past relevant work; and

(5) If not, can the claimant make the adjustment to other work in the national economy.

See, e. g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

The reviewing court does not reconsider whether the claimant is disabled under this test; rather, the court reviews the ALJ's decision to ensure that it is supported by "substantial evidence" and based on the proper legal criteria. See, e.g., Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004); Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that

---

levels ordinarily indicative of SGA. See 20 C.F.R. § 404.1574(b)(2).

[2]An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);1521(a).

[3]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). If the claimant demonstrates that she meets or equals all of the criteria of a particular Listing, she will be found disabled. See Sullivan v. Zebley, 493 U.S. 521, 531 (1990).

[4]RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p.

decision falls on the ALJ. <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir.1997). The court does not decide the facts anew, re-weigh the evidence, re-determine credibility, or otherwise substitute its judgment for that of the ALJ. <u>See, e.g.</u>, <u>Terry v. Astrue</u>, 580 F.3d 471, 475 (7th Cir. 2009); <u>Powers v. Apfel</u>, 207 F.3d 431, 434-35 (7th Cir. 2000).

However, this does not mean that the court acts as an uncritical rubber stamp. <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984). The court must conduct a critical review of the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision. <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 351 (7th Cir. 2005). The court may not uphold a decision, even if the record contains evidence supporting it, if the ALJ failed to mention highly pertinent evidence or failed to build an accurate and logical bridge between the evidence and the outcome. <u>Parker v. Astrue</u>, 597 F.3d 920, 921 (7th Cir. 2010). Because judicial review is limited to the reasons set forth in the ALJ's decision, the Commissioner's lawyers cannot later fill in any gaps in the ALJ's reasoning. <u>See, e.g.</u>, <u>Campbell</u>, 627 F.3d at 306; <u>Larson v. Astrue</u>, 615 F.3d 744, 749 (7th Cir. 2010). Likewise, if the ALJ commits an error of law, reversal is "required without regard to the volume of evidence in support of the factual findings." <u>Binion</u>, 108 F.3d at 782. Because an administrative agency is bound by its own rules, an ALJ's violation of SSA regulations constitutes legal error. <u>See Terry</u>, 580 F.3d at 476; <u>see also</u> <u>Golembiewski v. Barnhart</u>, 382 F.3d 721, 724 (7th Cir. 2004).

## II. THE RECORD

### A. Treatment Records

The administrative transcript in this case includes plaintiff's treatment records dating back to the period just prior to her alleged onset date of November 8, 2006. On September 18,

2006, plaintiff visited her primary care physician, Dr. Pamela House, for follow-up of her asthma and hypertension. Dr. House found plaintiff to be doing well on Advair for her asthma, with no side effects. Plaintiff used albuterol once per week depending on whether she was exposed to pets or the weather was hot and humid. She continued to smoke. Her blood pressure was moderately well-controlled, although she did not monitor it regularly. She reported no chest pain, dyspnea, or light-headedness, and used no medications for hypertension. Dr. House refilled Advair and scheduled a recheck in six months, sooner if there was a problem. (Tr. at 205.)

Plaintiff returned to Dr. House on November 9, 2006, complaining of back pain of several months' duration. The pain was non-radiating, but she sometimes noticed numbness and tingling in the bilateral buttock area. Plaintiff indicated that within the past few days she was unable to bend or twist, and that it was very difficult for her to do her job as a housekeeper. Ibuprofen helped initially, but no longer. Because of her pain, she had not been driving and had trouble sleeping. On exam, Dr. House noted that plaintiff had extreme difficulty getting up from the chair to walk, her gait was antalgic, and she was always a little bit flexed at the spine. She was unable to have more than 80 degrees of flexion because of the pain, and extension was minimal, just a couple of degrees. Lateral bending was 10 degree bilaterally with complaint of pain. She was very tender on palpation of the SI joints bilaterally, right worse than left. She also had tenderness over the sciatic notches bilaterally. (Tr. at 203.) She was unable to raise her right leg over 45 degrees and her left leg over 30 degrees. Dr. House prescribed Toradol and physical therapy, and provided restrictions for work for one week, with a recheck at that point. (Tr. at 204.)

Plaintiff returned to Dr. House on November 15, 2006, getting better overall but with

4

continued significant pain when walking. She had completed two sessions of physical therapy but could not fill a prescription for Tylenol with codeine because of lack of money, so she had been taking ibuprofen, which helped mainly with her upper back. She also complained of weakness in both legs, to the point where a few days ago she was unable to walk half a block without feeling as if she was going to collapse. On exam, Dr. House noted plaintiff to have less difficulty getting up from the chair, and her gait was a little less antalgic. She was still extremely tender on palpation of her lumbosacral spine, SI joint, and in the left sciatic notch. (Tr. at 197.) Dr. House assessed back pain, very slightly improved, and bilateral leg weakness. She ordered x-rays and continued physical therapy. (Tr. at 197.) If the situation did not improve, she would obtain an MRI. (Tr. at 198.) The lumbar spine and hip x-rays, obtained on November 15, came back negative. (Tr. at 199-202.)

Plaintiff returned for a recheck on November 22, 2006, reporting her pain 30% better with physical therapy and medication. Dr. House scheduled an MRI based on weakness and lack of progress. Plaintiff's employer was unable to accommodate her restrictions, so she was not working at the time. The pain was still localized mostly in the right low back, radiating now more towards the groin and sometimes the posterior aspect of her leg. Tylenol #3 and ibuprofen helped with the pain. On exam, plaintiff was still quite antalgic with her gait but not as severe as before. Flexion was 85 degrees, extension 5 degrees, and left side bending 20 degrees. Right side bending was 30 degrees, an improvement. On palpation she was extremely tender, and Dr. House could barely palpate her low back without making her jump. Dr. House assessed low back pain with some sacroiliac dysfunction and possibly some radiculopathy. (Tr. at 195.) Pending the MRI, plaintiff was to continue with therapy and her medications. (Tr. at 196.) The MRI, completed on November 28, 2006, revealed no stenosis

5

or disc herniation, with age-related changes involving the L1-2, L2-3, and L3-4 discs.  (Tr. at 193-94.)

Plaintiff returned to Dr. House on December 6, 2006, reporting some improvement with physical therapy.  She was still off of work because of the physical nature of her job.  Tylenol with codeine did not help with pain at night, and she wanted something else.  During the day, she took ibuprofen, which helped some.  On exam, Dr. House noted that plaintiff continued to have difficulty getting up from the chair, and she had minimal range of motion.  (Tr. at 191.) Although plaintiff would continue to receive physical therapy and the MRI was unremarkable, Dr. House referred plaintiff to a pain specialist due to the lack of progress.  (Tr. at 191-92.)  She also switched plaintiff from Tylenol #3 to Ultram.  Dr. House continued plaintiff's restrictions, which precluded work, and filled out short-term disability forms.  Finally, Dr. House provided Toradol 50 mg intramuscularly.  (Tr. at 192.)

On December 13, 2006, plaintiff advised Dr. House that she was no better.  She had discontinued physical therapy due to lack of improvement and had an appointment with Dr. Dervish, a pain management specialist, on December 27.  She continued to have low back pain, mostly on the right side, non-radiating, and continued to take Tramadol as needed for pain.  On exam, plaintiff's gait was very antalgic although much improved since her last visit. She still walked bent over, although just five degrees rather than ten or fifteen like before.  On range of motion testing, flexion was 80 degrees; extension a couple of degrees; and lateral bending to the right 10 degrees, to the left just a couple of degrees.  She was still very tender on palpation of her lumbo-sacral area and on the right sciatic notch.  Dr. House assessed back pain, not improving, and waited to see what Dr. Dervish suggested.  (Tr. at 189.)

Plaintiff returned for recheck of her back pain on December 20, 2006, but also reported

a new problem of dizziness for the past three days, low-tone noises and pulsating in her ears, and double vision for several minutes the previous day, which she attributed to rising blood pressure. Her back pain was better, with her pain rated 5 on a 0-10 scale. She remained off work due to her back. Her pain remained mostly in the low back on the right side, non-radiating, with no numbness, tingling, or weakness. On exam, plaintiff's blood pressure was 156/100. (Tr. at 187.) Her gait was slightly antalgic; she walked more upright and not as flexed at the waist. She was still tender on palpation on the right side. Range of motion was flexion 45 degrees, extension 5 degrees, and lateral bending to the right 20 degrees and to the left 10 degrees. Dr. House assessed hypertension, dizziness, and back pain, very minimally improved. She provided Norvasc for hypertension and awaited Dr. Dervish's recommendations regarding back pain. (Tr. at 188.)

Plaintiff saw Dr. Dervish on January 3, 2007, reporting steady pain, 6 out of 10 in severity, worse with standing, walking, bending, and sitting too long. Physical therapy produced no change. Plaintiff reported smoking ½ pack of cigarettes per day. (Tr. at 184.) On exam, straight leg raising was negative, deep tendon reflexes intact, and motor and sensory examinations within normal limits. Dr. Dervish noted that the diagnostic studies revealed normal hips, no significant degenerative disc disease, and very mild sacroiliac changes at the L5-S1 and L4-L5 level. Dr. Dervish noted that plaintiff may have significant facet contribution of facet joint dysfunction related pain, especially from the L4-5 and L5-S1 level. She may also have significant sacroiliac joint dysfunction related pain. Given the failure of physical therapy to return plaintiff to work, Dr. Dervish recommended bilateral facet injections for diagnostic and therapeutic reasons. He also provided Flexeril for better sleep and muscle relaxation, and Tramadol every six hours as needed for pain. Dr. Dervish indicated that when plaintiff felt like

7

it she could go back to work at least half-time.  She had been off work since November, "which is not a good sign."  (Tr. at 185.)

Plaintiff also saw Dr. House on January 3, 2007, reporting that her blood pressure medication caused headaches.  She reported that her back was about the same, maybe slightly better.  She had not yet received the epidural injection or started on Flexeril.  On exam, her ambulation was about the same; she still walked bent over at the waist.  Her range of motion was flexion, 85 degrees; extension, 10 degrees; and lateral bending 15 degrees to the right and 5 degrees to the left.  She was still extremely tender to the touch all over the right lumbosacral sacroiliac and buttock area.  (Tr. at 182.)  Dr. House discontinued Norvasc and provided samples of Benicar.  She also renewed plaintiff's work restrictions.  (Tr. at 183.)

On January 10, 2007, Dr. Dervish administered a bilateral lumbar facet joint injection. (Tr. at 180.)  Plaintiff returned to Dr. Dervish's office on January 24, 2007, reporting her pain 3-4/10 before work and 7-8/10 at the end of the day.  She denied any relief from the injection. Her pain was still aggravated with standing, walking, and sitting for any period of time.  Plaintiff reported that she had returned to work as of that Monday, 3 ½ hours per day, with significant pain after working even that short period of time.  Plaintiff reported using Tylenol and Tramadol, but had not filled the Flexeril prescription because she could not afford it.  (Tr. at 176.)  On exam, she had tenderness in the low back region, particularly on the right side with palpation. Given the lack of relief from the facet joint injection, Dr. Dervish declined to proceed with that again.  (Tr. at 177.)  He did encourage her to fill the Flexeril prescription.  Work restrictions were continued for working a maximum of 3 ½ hours per day, five days per week, to be re-evaluated in one month's time.  Dr. Dervish also scheduled bilateral sacroiliac joint injections, given plaintiff's increased pain and tenderness with palpation to this area.  They also discussed

8

the possible use of a transcutaneous electrical nerve stimulation ("TENS") unit, if the injections provided no relief.  (Tr. at 178.)

Plaintiff also saw Dr. House on January 24, 2007, with Dr. House noting that Dr. Dervish had assumed primary responsibility for plaintiff's back and work restrictions.  Dr. House rechecked plaintiff's blood pressure, noting little improvement, and changed medications. However, she noted that until plaintiff's pain was brought under control, it was unclear how much her blood pressure could be controlled.  (Tr. at 174-75.)

On February 7, 2007, Dr. Dervish administered the sacroiliac injection (Tr. at 172), but it did not improve plaintiff's pain, not even for a short period of time (Tr. at 168).  She reported pain 3/10 on the pain scale, aggravated with walking, standing, and sitting for any length of time. She continued to work part-time, 3 ½ hours per day, and used Tramadol, Tylenol #3, and Flexeril for pain.  (Tr. at 168.)  On exam, plaintiff had negative straight-leg raising, but tenderness to light palpation in the lower back region, particularly on the right side.  Sacroiliac joint provocation test was positive on the right and suggestive on the left.  However, the precise cause of her pain was unknown.  (Tr. at 169.) Plaintiff's medications and work restrictions were continued, but she was encouraged to start trying to work longer hours.  Plaintiff responded that even 3 ½ hours was difficult.  She was also set up for a TENS unit in the hopes that it would provide some relief.  She was to be reevaluated in one month, hopefully to return to work full-time at that point.  (Tr. at 170.)

Plaintiff returned to Dr. Dervish's office on March 28, 2007, reporting her pain about the same, 6-7/10.  The worst of the pain was centralized in the low back, although she did experience some radiation into the right hip and thigh after extensive walking.  She requested a less potent muscle relaxer, as Flexeril made her groggy.  She reported having the TENS unit

9

for the past couple of months, which provided some relief in the evening when her pain acted up after work.  (Tr. at 164.)   Plaintiff continued to experience significant tenderness on palpation of the low back.  (Tr. at 165.)  Given the failure  of other treatment modalities, Dr. Dervish elected to try a lumbar epidural steroid injection.  Plaintiff was to continue working with her restriction to 3 ½ hours per day.  She was also to continue using her TENS unit.  Dr. Dervish also provided a prescription for Zanaflex, to be taken every eight hours as needed. (Tr. at 166.)

Plaintiff also saw Dr. House on March 28, 2007, for medication recheck, with her blood pressure still elevated and not well-controlled, but with asthma doing well on Advair and albuterol.  She continued to smoke and was not ready to quit.  Dr. House increased her blood pressure medication dosage.  (Tr. at 162.)

On April 4, 2007, Dr. Dervish performed the lumbar injection (Tr. at 160), but plaintiff again reported that it did not work (Tr. at 157).  She reported pain 5/10, unimproved with the TENS unit.  Her sleep was not good, and she reported occasional severe pain other than the constant aching-type pain.  (Tr. at 157.)  Back exam revealed tenderness with palpation and diminished range of motion.  Dr. Dervish explained that they were running out of options, electing to apply a Lidoderm patch to the area, twelve hours on and twelve hours off to see if that helped.  He continued her other medications.  (Tr. at 158.)

Plaintiff returned to Dr. Dervish's office on May 2, 2007, reporting that the patches caused increased muscle spasms and pain in her feet, so she discontinued their use.  (Tr. at 153.)  She continued to work 3 ½ hours per day but reported even that was too much for her. (Tr. at 154.) Dr. Dervish's PA-C, Teasha Kaepernick, indicated that they had run out of options to manage plaintiff's pain.  (Tr. at 154.)  Plaintiff was advised to follow up with Dr. House.  (Tr.

at 155.)

Plaintiff saw Dr. House on May 4, 2007, with an antalgic gait and slow to get up from the chair. Range of motion of the spine was flexion, 80 degrees; extension, 10 degrees; and lateral bending 15 degrees to the right and 5 degrees to the left; with complaints of pain in all directions except for right side bending. Dr. House referred her to physiatry and noted that plaintiff was working 3 ½ hours but faced job loss unless she increased to four hours, which plaintiff wanted to try. (Tr. at 150.) Dr. House gave her the okay to go with four hours. (Tr. at 151.) A repeat lumbar MRI completed on June 2, 2007, revealed mild degenerative changes with no significant change since the November 28, 2006 scan. (Tr. at 148-49.)

On September 14, 2007, plaintiff saw Dr. John Boyle, on referral from the emergency room, which she had visited two days previously complaining of right wrist pain. Dr. Boyle diagnosed tendonitis and provided an injection. (Tr. at 146.)

On October 30, 2007, plaintiff saw Dr. Douglas Hendricks, a physiatrist, who performed a left sacroiliac joint injection. (Tr. at 144.) Plaintiff saw Dr. House for drainage of a boil the next day. (Tr. at 142-43.)

On January 23, 2008, plaintiff saw Dr. Philip Yazbak, a neurosurgeon, on referral from Dr. House. On exam, she had tenderness to palpation of the low back, and lumbar range of motion limited in all directions due to discomfort. (Tr. at 227.) Her MRI was about as normal a lumbar MRI as Dr. Yazbak had seen in a woman age fifty. He provided information regarding Medtronic peripheral stimulators, finding her an appropriate candidate for a trial of field stimulation for her focal low back pain. She was to contact his office following review of these materials. (Tr. at 228.) Plaintiff contacted Dr. Yazbak's office on March 25, 2008, looking to schedule the surgery. She also advised that a brother had been diagnosed with fibromyalgia

11

and wondered if this was possible for her. Dr. Yazbak advised that fibromyalgia does not run in families, but plaintiff may have the condition as they had no other diagnosis for her. (Tr. at 224.) Dr. Yazbak surgically installed the stimulator device on April 9, 2008 (Tr. at 223), but when plaintiff returned to his office on April 16, 2008, she reported no result in pain management – it actually aggravated her pain. Dr. Yazbak had her follow-up with Dr. Hendricks for additional pain management. (Tr. at 220.)

On July 16, 2008, plaintiff saw Dr. Marlon Hermitanio, a rheumatologist, on referral from Dr. Hendricks. (Tr. at 234.) On exam, Dr. Hermitanio noted multiple diffuse tender points, 12 out of 18, with significant trigger points along the lumbosacral area. However, because she did not complain of diffuse aches and pain, she could not be labeled as having fibromyalgia. See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) ("The principal symptoms [of fibromyalgia] are 'pain all over,' fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."). Dr. Hermitanio recommended a muscle relaxant such as Zanaflex. (Tr. at 236.)

On October 12, 2009, Dr. House filled out a medical source statement, stating that plaintiff could occasionally lift/carry ten pounds, frequently lift/carry less than ten pounds; stand/walk less than two hours in an eight hour day; and sit continuously for less than six hours in an eight hour day. (Tr. at 237.)

## B.    Consultants' Reports

The record also contains the reports of two consultants engaged by the SSA, through the state agency, to evaluate plaintiff's claim. On February 8, 2008, Dr. Mina Khorshidi

reviewed plaintiff's medical records and completed a physical RFC assessment, finding plaintiff capable of medium work, i.e., lifting up to fifty pounds occasionally, twenty-five pounds frequently; standing/walking about six hours in an eight hour day; and sitting about six hours in an eight hour day, with no other limitations. (Tr. at 207-14.) Dr. Syd Foster reviewed and affirmed this assessment on May 29, 2008. (Tr. at 230.)

## C.    Hearing Testimony

Finally, the record contains the transcript of the hearing before the ALJ. Plaintiff testified that she was born on June 12, 1957, and her highest level of education was a GED. (Tr. at 27-28.) For the past three years, she had lived with her son, his fiancé, and their five children. (Tr. at 28, 32.) Asked if she helped care for her grandchildren, plaintiff stated that she spent time with her granddaughter – laying in the couch and watching cartoons – but her son was also home during the day. Plaintiff stated that she occasionally drove. (Tr. at 28.)

As indicated above, plaintiff claimed a disability onset of November 2006, but testified that she continued to work, part-time, until June 2008.[5] (Tr. at 28.) She explained that she worked full-time as a housekeeper prior to November 2006, at which time she was taken off work completely for two months; she then returned 3 ½ hours per day for about a year. She tried to increase to four hours per day but was terminated from her job.[6] (Tr. at 28-29, 33.) She testified that her restriction to four hours per day had never been removed. (Tr. at 33.)

---

[5]Plaintiff earned $20,596.40 in 2006, $11,007.17 in 2007, and $5310.27 in 2008. (Tr. at 78.)

[6]In a pre-hearing submission, plaintiff stated that she was off work from November 8, 2006 to the end of December 2006, after which she returned to work, 3 ½ hours per day, five days per week. In May 2007, he employer required her to increase to four hours per day. (Tr. at 99.)

She testified to previous jobs at a gas station and dry cleaner/laundry.[7]  (Tr. at 29.)

Asked why she could not work full-time, plaintiff pointed to her back pain, indicating that she had to rotate between standing, sitting, and walking.  (Tr. at 30.)  The ALJ noted that the MRIs showed nothing significant, but plaintiff testified that one of her doctors diagnosed myofascial pain syndrome.  (Tr. at 30)  Asked about treatment, plaintiff testified that she had no insurance to obtain prescriptions so she had "just been fighting the pain," using over-the-counter Tylenol and ibuprofen, which helped a little.  (Tr. at 30.)  She previously used prescription medications – Tramadol, Tylenol with Codeine, and Flexeril – but could no longer afford them.  (Tr. at 33.)

Plaintiff testified that she needed to change positions from seated to standing and walking around every twenty minutes to ½ hour.  (Tr. at 30-31.)  She stated that most of the time she was laying down on the couch at home.  (Tr. at 31.)  She stated that she could stand for about ½ hour before she had to lie down.  She said that the most she could lift was ten pounds; she could not lift her twenty pound granddaughter.  (Tr. at 31.)  Plaintiff testified that she cooked perhaps once per week, simple things like hotdogs or macaroni and cheese; she used to cook more elaborate meals but no longer could due to her inability to stand the length of time required.  The teenaged children did most of the household chores.  (Tr. at 31, 32.)  She was able to tend to her personal care.  (Tr. at 31.)

The ALJ summoned a vocational expert ("VE") to the hearing, and the VE described plaintiff's past work history as a gas station cashier as light, unskilled work; dry-cleaning attendant as medium work; hospital housekeeper as medium work but performed at the light

---

[7]In a pre-hearing submission, plaintiff indicated that she worked as a cashier from 1996-1997, as dry cleaner from 1998-2000, and housekeeper from 2000 to the present.  (Tr. at 106.)

level; hotel housekeeper as light work; and laundry worker as light work. (Tr. at 34.) The ALJ then asked a hypothetical question, assuming a person closely approaching advanced age, high school equivalency education, and work experience as plaintiff's, prophylactically limited to light work with no concentrated exposure to extreme heat and humidity or animal hair. (Tr. at 34.) The VE testified that such a person could perform the position of gas station cashier or housekeeper. (Tr. at 34.) On questioning from plaintiff's lawyer, the VE testified that a person limited to sedentary work could not perform any of plaintiff's past jobs, and a person limited to four hours per day would be precluded from all work. (Tr. at 35.)

### III. THE ALJ'S DECISION

Relying on the VE's testimony, the ALJ denied plaintiff's claim, finding that plaintiff retained the RFC to perform her past work as a gas station cashier and housekeeper. (Tr. at 20.) While the record contains evidence supporting denial, the ALJ's decision contains too may flaws to sustain, so the matter must be remanded.

The ALJ started off on the wrong foot by stating that plaintiff chose to appear and testify without an attorney or other representative (Tr. at 15); plaintiff in fact appeared with counsel at the hearing (Tr. at 24). The ALJ then found that while plaintiff worked part-time following the alleged disability onset date on November 8, 2006, her earnings did not rise to SGA levels. The ALJ nevertheless found that this work activity suggested significant work capacity. (Tr. at 17.) However, at no point in the decision did the ALJ link this observation with her RFC or other findings. Moreover, under SSR 96-8p, the ability to work only part-time mandates a disability finding. See Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000).

The ALJ next found that plaintiff suffered from the severe impairments of asthma and disc bulging and age-related changes to the lumbar spine, neither of which met or equaled a

15

Listing. (Tr. at 17.) The ALJ then confusingly stated that plaintiff retained the RFC for light work, except for prophylactic limitation to light work [sic], lifting/carrying ten pounds frequently and twenty pounds occasionally, and preclusion from concentrated exposure to extreme heat, humidity, and animal hair.[8] (Tr. at 18.) Perhaps the ALJ meant to state that plaintiff retained the RFC for <u>medium work</u>, as the state agency consultants opined, yet preventively limited her to lifting at the light level to avoid aggravation of her back pain; but the decision does not say that.[9] Nor did the ALJ assess all of plaintiff's abilities on a function-by-function basis before expressing RFC in terms of an exertional category, as SSR 96-8p requires.[10]

After setting forth her RFC determination, the ALJ discussed some of the medical evidence, including the x-ray and MRI results, which showed no significant abnormalities, and the treatment notes from Dr. House, Dr. Yazbak, and Dr. Hendricks. (Tr. at 18-19.) In reviewing the medical evidence, however, the ALJ attributed to Dr. Hendricks the opinions of Dr. Hermitanio. (Tr. at 19, 234.) This would not alone constitute reversible error – the ALJ did

---

[8]The ALJ stated that she was giving plaintiff the "benefit of the doubt" regarding her asthma, which was well-controlled, by restricting plaintiff from concentrated exposure to extreme heat and humidity and animal hair. (Tr. at 20.)

[9]The ALJ found the opinions of the state agency consultants "fully credible based upon supportability with medical signs and laboratory findings, and consistency with the record[.]" (Tr. at 20.) This finding does suggest that the ALJ believed plaintiff capable of medium work. <u>See also</u> 20 C.F.R. § 404.1567(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work."). However, the court must confine its review to the reasons set forth in the decision; neither the court nor the Commissioner's lawyers can fill in gaps in the ALJ's reasoning. <u>See, e.g.</u>, <u>Larson</u>, 615 F.3d at 749.

[10]As the Commissioner notes, Dr. Khorshidi's report does contain a function-by-function assessment. Further, SSR 96-8p and the cases construing it distinguish between what the ALJ must <u>consider</u> and what she must <u>articulate</u> in her written decision. <u>See, e.g.</u>, <u>Lewis v. Astrue</u>, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007). Thus, if this were the only flaw in the ALJ's decision, the result might be different.

not misstate what Dr. Hermitanio found – but it contributes to the impression that the ALJ's review of the record was not as careful as plaintiff deserved.

The ALJ further stated that in making her RFC finding she considered plaintiff's symptoms and the opinion evidence. (Tr. at 18.) As to plaintiff's credibility, the ALJ stated that plaintiff's "impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment[.]"  (Tr. at 19.)  This boilerplate language, which routinely appears in ALJ decisions, yields no clue as to what weight the ALJ gave plaintiff's testimony and effectively turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not rather than evaluating credibility as an initial matter in order to come to a decision on the merits.  Courts in this circuit have soundly rejected this sort of credibility finding.  See, e.g., Martinez v. Astrue, 630 F.3d 693, 694 (7th Cir. 2011); Spiva v. Astrue, 628 F.3d 346, 438 (7th Cir. 2010); Parker, 597 F.3d at 921-22; Crae v. Astrue, No. 1:10–cv–0595, 2011 WL 2728124, at *4-5 (S.D. Ind. July 8, 2011); Heichelbech v. Astrue, No. 3:10–cv–65, 2011 WL 1876181, at *13 (S.D. Ind. May 17, 2011); Sorenson v. Astrue, No. 10-C-0582, 2011 WL 1043362, at *8 (E.D. Wis. Mar. 18, 2011); McGee v. Astrue, 770 F. Supp. 2d 945, 948 (E.D. Wis. 2011); Weber v. Astrue, No. 09-C-0912, 2010 WL 1904971, at *5 (E.D. Wis. May 11, 2010); see also Punzio v. Astrue, 630 F.3d 704, 709 (7th Cir. 2011) ("[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence.  That is reason enough for us to reverse the judgment[.]").

"It may in some cases be possible to overlook the use of this seemingly ubiquitous

17

language if, in the body the ALJ's decision, the court is able to find specific reasons for finding the claimant's allegations incredible or exaggerated," Sorenson, 2011 WL 1043362, at *9 (citing cases), but no such reasons can be found here. Based on the ALJ's assessment of the x-ray and MRI findings, it is obvious that the ALJ found plaintiff's pain complaints inconsistent with the objective medical evidence. (Tr. at 18-19.) However, as the ALJ herself noted (Tr. at 19) and as the regulations state, once the ALJ has accepted that the claimant suffers from an impairment that could produce the pain or other symptoms alleged, the "ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); SSR 96-7p. Rather, the ALJ must consider the entire record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

The ALJ reviewed plaintiff's testimony regarding her need to alternate positions, her sitting/walking restrictions, and her lifting limitations, but made no specific finding as to the credibility of those statements. The ALJ also summarized plaintiff's daily activities: "She spends most of the time lying in the couch. She can do some minimal cooking but others do the household chores. [She] is able to drive and does so occasionally." (Tr. at 19.) These minimal daily activities are not inconsistent with a claim of disability, see, e.g., Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004), and the ALJ did not seem to find otherwise; nor did the ALJ find that plaintiff understated her activities.

18

The ALJ concluded that: "The claimant has not had any treatment in 2009 and takes only over-the-counter Tylenol and ibuprofen, but testified that is because she has no insurance and is unable to afford medication. She is able to afford cigarettes, which she continues to smoke against medical advice." (Tr. at 19.) Lack of treatment is a permissible factor on which to base an adverse credibility finding, see Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008), but as the ALJ seemed to recognize, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. Inability to afford treatment is a valid explanation for failure to seek it. Neave v. Astrue, 507 F. Supp. 2d 948, 964 (E.D. Wis. 2007) (citing Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 133 (2d Cir. 2000); Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995); Caviness v. Apfel, 4 F. Supp. 2d 813, 819 (S.D. Ind. 1998)).

Further, the record indicates that plaintiff previously received significant treatment for her back pain – physical therapy; prescription pain medications including Tramadol, Tylenol with codeine, and Flexeril;[11] injections to the lumbar facet joint, sacroiliac joint, and lumbar spine; a Lidoderm patch; a TENS unit; and the implantation of a "peripheral stimulator." It seems improbable that she would have undergone all of these pain-treatment procedures "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits." Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir.)

---

[11]In pre-hearing submissions, plaintiff indicated that her medications did not work and caused side effects of drowsiness and upset stomach. (Tr. at 123, 135.)

2004). And given that none of these modalities helped her pain, plaintiff's decision to forego still more expensive treatment may have been reasonable, even setting her financial situation aside. See Parker, 597 F.3d at 922 (reversing credibility determination based on the claimant's failure to follow-up at a pain clinic where the claimant may have believed that further treatment would not cure her pain).

This leaves the ALJ's observation that plaintiff found the money for cigarettes and continued to smoke against medical advice.[12] While it may be appropriate for the ALJ to consider the claimant's decision use scarce funds for cigarettes rather than medical treatment, see, e.g., Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that the ALJ properly considered that the claimant did not choose to forgo smoking three packs of cigarettes a day to help finance pain medication), the record should contain some evidence that the savings from smoking cessation would permit the claimant to obtain needed treatment, see Madron v. Astrue, 311 Fed. Appx. 170, 179 n.7 (10th Cir. 2009) (stating that there can be no general presumption that a claimant who smokes can afford basic medical care; there must be some

---

[12]Earlier in her decision, the ALJ stated that plaintiff requested a restriction to 3 ½ hours of work, which Dr. House approved, but Dr. House wanted plaintiff to increase her hours, which plaintiff opposed. (Tr. at 18.) However, the record indicates that plaintiff wanted to increase her hours from 3 ½ to 4, with Dr. House "giving her the okay to go with four hours a day." (Tr. at 150-51.) The ALJ also stated that Dr. Yazbak questioned why plaintiff was limited to four hours per day. (Tr. at 18.) I found no such statement in Dr. Yazbak's notes; the only reference to work restrictions in Dr. Yazbak's records consists of two notes from a nurse: the first indicating that she will send plaintiff a work slip for four hours a day, five days a week, until the surgery date (Tr. at 222); and the second referencing the previous letter and asking how long these restrictions are to stay in effect (Tr. at 218). Thus, the record does not support the ALJ's statements. In any event, the ALJ never linked these statements to her credibility finding. In his brief, the Commissioner cites Dr. Dervish's notes regarding plaintiff's part-time status, but because the ALJ did not rely on this evidence I will not consider it now. See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) (holding that the court must confine its "review to the reasons supplied by the ALJ").

showing that quitting would meaningfully improve the claimant's financial ability to avail herself of the specific treatment at issue) (citing McKnight v. Sullivan, 927 F.2d 241, 242 n.1 (6th Cir. 1990)). Here, the ALJ made no finding as to how much plaintiff spent on cigarettes, or that she could have afforded treatment had she quit. (And I suspect that most doctors encourage their patients to quit smoking, regardless of the expense of buying cigarettes.) Without some further explanation as to how plaintiff's continued smoking impacted her (in)ability to obtain treatment, I cannot rely on this contention to uphold an otherwise boilerplate credibility determination.[13]

[13]It will be up to the ALJ on remand to explore, based on a complete record, whether plaintiff's smoking expenses truly interfered with her ability to obtain treatment. However, to stave off any argument that the ALJ's error was harmless or that remand on this basis would be pointless, I have taken a quick look at the issue. As the ALJ noted and as the treatment records reflect, plaintiff smoked about ½ pack of cigarettes per day. (Tr. at 18, 177, 184.) A pack of cigarettes in Wisconsin costs about $6.70, $3.40 or less if purchased on-line. See http://wiki.answers.com/Q/How_much_does_1_pack_of_cigarettes_cost_in_wisconsin. Using this estimate, plaintiff's monthly cigarette bill would be about $100.50. As discussed above, plaintiff's doctors prescribed a variety of pain medications and muscle relaxers. According to a pre-hearing submission, plaintiff took APAP (a/k/a Tylenol) with codeine, four tablets per day; Tramadol, one tablet every four hours; and Cyclobenzaprine, one tablet every six hours. (Tr. at 138.) In her submission to the Appeals Council, plaintiff estimated the cost of her medication at about $450 per month, exclusive of doctor's visits and testing. (Tr. at 10.) The record does not contain evidence as to how much these medications would cost a person without insurance, but internet sources suggest that plaintiff's earlier estimate is not off base: 120 tablets of Tylenol with Codeine cost $159.96, see http://www.drugstore.com/tylenol-with-codeine-4/300-60mg-tablets/qxn00045051560; Tramadol costs $62.17 per month, see http://www.everydayhealth.com/drugs/tramadol#cost; and a thirty pill supply of Cyclobenzaprine costs about $100, see http://wiki.answers.com/Q/How_much_does_a_cyclobenzaprine_cost, such that if plaintiff took four pills per day, her monthly cost would be around $400. Thus, setting aside the cost of seeing a physician to obtain a prescription, it appears that these pills would cost several times as much as plaintiff spends on cigarettes. See McElhaney v. Astrue, No. C10-5387, 2011 WL 1045760, at *6 (W.D. Wash. Mar. 21, 2011) (holding that the ALJ erred in assuming without foundation that the cost of cigarettes would cover the plaintiff's costs for medical treatment); Bates v. Commissioner of Social Sec., No. 3:09 CV 2349, 2010 WL 5698449, at *7 (N.D. Ohio Dec. 14, 2010) ("The cost of one to two packs of cigarettes per day is far less than the $4,000 per month Plaintiff testified her medications cost."); see also Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000) (finding it "extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful," and

The ALJ next turned to the report from Dr. House, stating: "I reject the extreme limitations found by the treating physician inasmuch as there is no medical pathology in the record that would justify the restrictions found. Treatment records do not document signs, symptoms, and/or laboratory findings or objective observations supportive of the limitations assessed[.]" (Tr. at 19-20.) This analysis is also lacking.

Under SSA regulations, opinions from a claimant's treating physician are entitled to special consideration. If such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." Clifford, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)). Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must determine the weight to give the opinion by considering a variety of factors, including (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention tending to support or contradict the opinion. See 20 C.F.R. § 404.1527(d). Regardless of the weight the ALJ ultimately affords the treating source opinion, she must always give "good reasons" for her decision. E.g., Campbell, 627 F.3d at 306.

The ALJ failed to follow the regulations in this case. Although the ALJ did not explain

_____

that given "the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health").

what sort of "medical pathology" would have justified Dr. House's restrictions, we can probably assume based on her statement regarding "signs, symptoms, and/or laboratory findings or objective observations" that she found the opinion unworthy of controlling weight. However, the ALJ offered no further analysis as to what weight, if any, the report deserved under the checklist set forth in § 404.1527(d). Further, while the ALJ mentioned the relatively normal x-ray and MRI findings, she failed to address the exam findings set forth in Dr. House's notes regarding plaintiff's limited range of motion, antalgic gait, and tenderness on palpation. The notes from Dr. Dervish and PA-C Kaepernick contain similar findings. Likewise, Dr. Hermitanio found multiple trigger points suggestive of myofascial pain syndrome (if not fibromyalgia). The ALJ endorsed the opinions of the state agency consultants, but such reports, standing alone, do not constitute substantial evidence justifying the rejection of a treating source's opinion. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).[14]

## IV.  CONCLUSION

Social security ALJs have a difficult job. See Martinez, 630 F.3d at 695 (discussing their heavy caseloads and lack of support). Reviewing courts must avoid the inclination to remand "in quest of a perfect opinion." Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). But where, as here, a combination of errors leaves the court with little confidence in the outcome,

---

[14]In his brief, the Commissioner argues that Dr. House's report is entitled to less weight because she stopped treating plaintiff's back pain in January 2007, ceding the issue to Dr. Dervish. The ALJ did not make this argument in rejecting the report, and it is improper for the Commissioner to make it now. See Steele, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ. That is why the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion.") (internal citations and quote marks omitted).

the matter must be remanded for reconsideration. The ALJ must on remand reconsider credibility and the treating source report, then re-evaluate RFC under SSR 96-8p and plaintiff's ability to return to past work under SSR 82-62 and other applicable regulations, and, if necessary, plaintiff's ability to make the adjustment to other work.

**THEREFORE, IT IS ORDERED** that the ALJ's decision **REVERSED**, and the matter is **REMANDED** for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of July, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge